**E-FILED on** 06/22/2011

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| EDGAR JEHOVANI LAZARO and JAIME LAZARO,<br><br>          Plaintiffs,<br><br>     v.<br><br>LOMAREY INC., PATRICK CORRIGAN, JARED TIKKER,<br><br>          Defendants. | No. C-09-02013 RMW<br><br>TENTATIVE PARTIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW AND REQUEST FOR FURTHER BRIEFING |

This matter was tried before the court beginning on November 15, 2010 and concluding on November 16, 2010. Plaintiffs Edgar Lazaro and Jaime Lazaro were represented by Adam Pedersen and Adam Wang of the Law Offices of Adam Wang. Defendants Lomarey, Inc., Patrick Corrigan, Vision Builders and Jared Tikker were represented by Edward Newman of Newman, Marcus & Clarenbach, LLP. Plaintiffs seek recovery of wages and penalties for overtime hours they claim they worked but for which they were not paid. The main issues are which of the defendants were employers of the plaintiffs, the number of overtime hours each plaintiff worked and the remedies to which each plaintiff is entitled. The court's tentative Findings of Fact and Conclusions of Law are

TENTATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND REQUEST FOR FURTHER BRIEFING
C-09-02013

set forth below. However, the court needs further guidance both with respect to what the parties claim the evidence received shows and the law that applies. Therefore, the court requests that the parties file revised proposed Findings of Fact and Conclusions of Law and supporting briefs to assist the court in finalizing its decision.

## I. TENTATIVE FINDINGS OF FACT

### A. Parties

1. Plaintiffs Jaime Lazaro ("Jaime") and Edgar Lazaro ("Edgar") (collectively the "Lazaros") were construction workers who were hired by defendant Jared Tikker ("Tikker") who did business as Vision Builders. Before working for Tikker, Jaime worked as a construction laborer for DPC Construction ("DPC"). Edgar is Jaime's nephew.

2. Lomarey, Inc. ("Lomarey") was a corporation whose primary business was private money lending. According to Patrick Corrigan ("Corrigan"), Lomarey's principal, Lomarey assisted its Pension and Profit Sharing Plan ("Plan") in building an apartment complex. Corrigan testified that the funding for that project came from the Plan but was run through Lomarey as the Plan had a limit on the number of checks it could write.

3. DPC Construction ("DPC") was a joint venture of Corrigan and Daniel Poncabare ("Poncabare"). Corrigan was apparently the source of funds for DPC's projects and Poncabare supervised the construction work as general contractor. Tikker worked for DPC starting in 2002 or 2003. Jaime worked for DPC starting in 2004. Jaime was paid as an employee of DPC with his payroll checks showing hours worked, employee deductions and withholding.

4. Tikker was a general contractor who did business as Vision Builders, a sole proprietorship. Although Tikker was a licensed general contractor, he carried no worker's compensation insurance, kept no records pertaining to his employees, provided no wage statements to the Lazaros during the time that they worked for him and did not take required payroll deductions from their pay. He apparently represented to the Contractors Licensing Board that Vision Builders had no employees. Corrigan, on behalf of Lomarey, hired Vision Builders (Tikker) on "a handshake" as the general contractor for construction of an apartment complex. No written evidence

TENTATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND REQUEST FOR FURTHER BRIEFING
C-09-02013
2

was offered showing the relationship among Tikker, Vision Builders, Lomarey, the Lomarey Plan and Corrigan.  The testimony from Tikker and Corrigan on the subject was vague and lacking in detail. Tikker did not distinguish between Lomarey and its Plan in his testimony.  In fact, he referred to Lomarey, Inc. as the owner of the project and never mentioned the Plan.  Tikker referred only to Lomarey when discussing the procedure for payment of the construction workers on the apartment complex.  Similarly, defense counsel referred to Tikker as working on two projects during the relevant time period, one for Corrigan and the other for Lomarey, Inc.  What's more, defense counsel made no mention of the Plan in his opening statement, the Pretrial Conference Statement or the defendants' proposed Findings of Fact and Conclusions of Law.  In addition to doing construction work for Lomarey, Tikker was a Lomarey real estate sales agent operating under Corrigan's broker's license.  He sought borrowers for Lomarey's trust deed investment business and also did some property inspections.  Tikker apparently received a commission on any loan transaction he brought to Lomarey.

     5.  Corrigan was the sole principal of Lomarey and its licensed real estate broker. He was responsible on behalf of Lomarey for the apartment complex project.  Corrigan and Tikker had been friends for several years at the time Corrigan hired Tikker to be the general contractor on the apartment complex project.  Tikker received a flat fee of $80,000 for his work as the general contractor on the project.  Corrigan also personally formed a joint venture with Tikker to remodel a home and build a new residence on adjacent property.  Corrigan and Tikker split their profits on that project.  Corrigan also funded the construction of a new home for Tikker on property which was in Corrigan's name.  Upon completion, Tikker was to put the home in his name and obtain a permanent loan.  Whether Tikker did so was not addressed.  Corrigan received no fee or compensation for his role—he merely did this as an accommodation for his friend.  The evidence was not clear as to whether Corrigan and Tikker did other construction projects together.

     **B. Tikker's Hiring of Jaime and Edgar Lazaro and the Work They Performed**

     6.  Tikker met Jaime in approximately 2003 when they both worked for DPC doing construction work.  Jaime was paid for his work as an employee with checks signed by Corrigan and

TENTATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND REQUEST FOR FURTHER BRIEFING
C-09-02013

written on DPC's payroll account.[1]  The DPC checks issued to Jaime for his labor included wage statements showing his hours, rate of pay, withholding, social security and other required employee deductions.  Sometime in 2005, Poncabare fired Jaime.  Thereafter—the evidence suggests around July 2005—Tikker hired Jaime as a construction worker because Tikker was beginning work as the general contractor on the Lomarey apartment complex project and needed construction laborers.  Thereafter, Jaime worked primarily on the Lomarey apartment complex project, but apparently also did work on other Corrigan and Tikker projects.  Some DPC payroll checks were introduced that purportedly show payment to Jaime for labor performed in late October 2007 for DPC.  No explanation was given as to whether these checks were actually for work on a DPC project.  No one testified that Jaime had been rehired by DPC after he had been fired by Poncabare at DPC or that he ever worked on a DPC project after he was fired.

   7.  Jaime worked for Tikker (Vision Builders) starting in approximately July 2005.  Tikker was solely responsible for the hiring and firing of both Jaime and Edgar.  Jaime testified that when he was hired, Tikker said that he (Jaime) was being hired on behalf of Lomarey and that is for whom Jaime thought he was working.  At the time Jaime was hired, Tikker apparently gave Jaime his Lomarey real estate sales agent business card.  Jaime did construction work as directed by Tikker until Tikker fired him on November 9, 2007 because Jaime appeared to be exaggerating the number of hours he worked.  The evidence is not entirely consistent as to which projects Jaime worked on and who was responsible for those projects.  However, it appears that Jaime was paid with Vision Builder's checks for labor on Tikker's personal projects, with Lomarey checks for labor on the apartment complex and with checks on Corrigan's personal account for labor on projects Tikker (Vision Builders) and Corrigan did personally.  There was no testimony explaining why some payments were made by DPC to Jaime for work purportedly done in late 2007.

   8.  Edgar periodically worked for Tikker (Vision Builders) from April 30, 2007 to November 9, 2007.  In approximately April 2007, Edgar asked Jaime if Tikker had work for him (Edgar).  At

---

[1] Jaime Lazaro may have also been paid for his work for DPC by checks written on Poncabare's personal bank account.

TENTATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND REQUEST FOR FURTHER BRIEFING
C-09-02013
4

that time, Jaime and Tikker were working on the Lomarey apartment complex. Edgar was employed when additional construction work needed to be completed. Edgar testified that Tikker told him he would be working for Lomarey. Most of Edgar's paychecks came from Lomarey, but some came from DPC. There was no testimony explaining why some wage payments were made to Edgar by DPC or that DPC ever employed Edgar. Tikker terminated Edgar's employment on November 9, 2007.

### C. Assignment and Supervision of Work

9. Corrigan and Tikker (Vision Builders) described their business relationship as that of owner (Lomarey on the apartment complex and Corrigan on his personal projects) and general contractor (Tikker). The apartment complex project was funded through a construction loan obtained by either Lomarey or its Plan. The evidence is not clear as to which entity actually took out the loan, but the funds were actually dispersed through Lomarey's checking account since, according to Corrigan, the Plan was limited on the number of checks it could write. The cost breakdown required by the bank for the construction loan was prepared by Tikker. Most, if not all, payments for the labor provided by the Lazaros on the apartment complex were made by Lomarey with checks signed by Corrigan. These checks did not include wage statements. Corrigan undoubtedly recognized that neither his office nor Tikker was causing the required payroll deductions to be taken and that overtime work was neither tracked nor paid for at overtime rates. Corrigan was a sophisticated developer, as he acknowledged that he had been doing projects for twenty-five years.

10. Corrigan was not involved in the day-to-day construction activities and claims he never met Jaime until sued in this litigation and has never met Edgar.

### D. Work Performed and Payment of Salaries

11. No one except Jaime kept any records of the hours that the Lazaros worked on the Lomarey apartment complex project or other projects in which Corrigan or Tikker participated. Jaime kept track of his and his brother's hours in a notebook and he went over those hours with Tikker every couple of weeks. At least on the apartment complex project, Tikker would verbally authorize the Lomarey office to issue checks for the hours the Lazaros worked. Corrigan instructed

his office at the beginning of the apartment project that checks were to be issued on Tikker's authorization. Corrigan signed the checks. This same procedure was apparently followed with the other projects on which the Lazaros worked, except that payment was made by Corrigan or Tikker, depending on the particular project. No wage statements were prepared. There were some DPC checks for labor written in late 2007. No evidence was introduced explaining the reason those checks were written on DPC's account.

12. Although Jaime's testimony and records concerning his work hours are suspect, particularly toward the end of his employment, those records are the only evidence presented that purports to capture all the hours worked by the Lazaros.

13. As a result of some break-ins at the apartment complex project, Tikker considered hiring a security company to make a couple of passes through the project during the night. The security company quoted a charge of $75.00 per day for the service. According to Tikker, he offered the job to Jaime because Jamie needed money to address some personal issues. At the time, Jaime was staying at Tikker's residence. Jaime took the security job and stayed in one of the units at the complex overnight after eating, showering and watching TV at Tikker's house. Jaime took a mattress from Tikker's home to sleep on and would leave a light on in one of the rooms to show presence. He would return to Tikker's house in the morning to shower and eat breakfast, if he wished to do so, before going to work. Jaime testified to a different version of the job. He claimed that he was not given a mattress and did not stay in a unit. Instead, Jaime claimed he made several rounds of the complex during the night. He did not sleep, but occasionally sat in his car because it was more comfortable. Jaime's testimony that he made several rounds during the night and did not sleep was not credible. The credible testimony was that Jaime agreed to and did stay in one of the unfinished units of the apartment complex to show a presence to discourage break-ins. This job lasted from approximately June 17, 2007 to September 14, 2007. It was not part of Jaime's job as a construction worker, but rather, a separate job he elected to take. The job required him to provide some presence at the job site. His work in this regard was not supervised, nor was he given any

TENTATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND REQUEST FOR FURTHER BRIEFING
C-09-02013

6

instructions as to how to perform the job except to leave a light on in one of the units and make a couple of passes through the units. Jaime was paid $75.00 per day for this service.

14. The Lazaros claimed that they were sometimes allowed one-half hour lunch breaks and at other times one-hour lunch breaks. Regardless, the Lazaros claim that even the one-half hour breaks were sometimes cut short. Whatever the period of the lunch break, it was deducted from the hours kept by Jaime. According to Tikker, the Lazaros were given a one-hour lunch break for which they were not paid. An hour was deducted from their hours each day for their lunch period, regardless of the time actually taken for lunch. The Lazaros typically watched a Hispanic soap opera at Tikker's house during lunch. Tikker denied that the Lazaros were ever refused a full lunch period. Tikker's explanation of what the workers generally did during their authorized one-hour lunch was more persuasive than the Lazaros' testimony that they often did not get even thirty minutes for lunch. It appears that the employees were basically free to take a one hour lunch period as they saw fit.

15. Accepting his records as accurate, Jamie worked _____ overtime hours during the period from May 1, 2006 to November 9, 2007 based upon the number of hours worked in excess of eight hours each day and _____ if based upon the number of hours in excess of forty hours per week. *[The court requests that plaintiffs fill in the number of overtime hours claimed with specific citations to the supporting evidence and that defendants cite to any evidence that disputes plaintiffs' calculation]* According to Jamie's records, Edgar's overtime hours for the period of April 30, 2007 to November 9, 2007 totaled _____ based upon the number of hours worked each day in excess of eight and _____ based upon the number of hours in excess of forty hours per week. *[The court requests that plaintiffs fill in the number of overtime hours claimed with specific citations to the supporting evidence and that defendants cite to any evidence that disputes plaintiffs' calculation]* Jaime's totals do not include 890 hours that he claims to have worked as a night watchman. Jaime's rate of compensation was $12 per hour from May 6, 2006 to September 15, 2006, $13 per hour from September 17, 2006 to March 6, 2007 and $16 per hour from March 7, 2007 to November 9, 2007. Although Jaime worked more than eight hours per day and forty hours

TENTATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND REQUEST FOR FURTHER BRIEFING
C-09-02013
7

per week, he was not paid overtime because, according to Tikker, he was paid an above market hourly rate and was provided housing, tools, meals and a vehicle. Defendants did not assert at trial that Jaime's allegedly premium wage or his purported acceptance of housing, tools or a vehicle constituted overtime wages. Edgar's hourly rate was $12 per hour for the entire period of his employment. Edgar also put in overtime hours.

16. The Lazaros filed this action on May 6, 2009.

## II. TENTATIVE CONCLUSIONS OF LAW

**A. First Count—Unpaid Overtime Wages (California Labor Code § 510)**

### 1. Nature of Claim

Plaintiffs Jaime and Edgar Lazaro claim that they were only paid their regular rates for their work in excess of eight hours per day and not one and one-half times their regular rates of pay as required by California Labor Code § 510. Plaintiffs claim that Tikker (Vision Builders), Lomarey, Inc. and Corrigan are all responsible for the unpaid overtime wages. Defendants contend that only Tikker (Vision Builders) was plaintiffs' employer and, therefore, is the only defendant responsible for payment of the overtime wages. Tikker admits that some overtime wage payment is due, but contends that the hours claimed are exaggerated.

### 2. Plaintiffs' Employer Under California Law

The parties do not dispute that Tikker (Vision Builders) was plaintiffs' employer. The disputed issue is whether Lomarey, Corrigan or both were also plaintiffs' employer and, if so, with respect to which projects. Both sides rely on the recent opinion from the California Supreme Court in *Martinez v. Combs*, 49 Cal. 4th 35 (2010) to support their positions. *Martinez* discussed in detail three applicable definitions of "to employ" in analyzing who is an employer liable for payment of minimum or overtime compensation under California Labor Code § 1194. California Labor Code § 1194 provides that "any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including

TENTATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND REQUEST FOR FURTHER BRIEFING
C-09-02013
8

interest thereon, reasonable attorney's fees, and costs of suit." The California Supreme Court in *Martinez* held that "[t]o employ . . . has three alternative definitions: It means: (a) to exercise control over the wages, hours or working conditions, or (b) to suffer or permit to work, or (c) to engage, thereby creating a common law employment relationship." *Martinez*, 49 Cal. 4th. at 64. Plaintiffs claim that the Lomarey and Corrigan employed plaintiffs under all three definitions. Defendants claim that Lomarey and Corrigan did not employ plaintiffs under any of the definitions.

      Although defendants' testimony concerning the relationship among Tikker, Lomarey and Corrigan was limited and vague, the evidence offered supports the conclusion that the Lomarey apartment construction project was a joint project of Tikker and Lomarey and its Plan, for which Tikker was the general contractor and Lomarey or its Plan was the owner. The other projects in which Tikker and Corrigan were involved were joint ventures. As to those joint venture projects, both Tikker and Corrigan were employers of Jaime and Edgar Lazaro under all three alternative definitions set forth in *Martinez.* As to the projects that Tikker did alone, only he was the employer.

      With respect to the apartment complex project, the evidence as it stands does not show employment by Corrigan or Lomarey under definitions (a) and (c). The essential question, therefore, is whether Corrigan or Lomarey allowed plaintiffs "to suffer or permit[ted them] to work." *Martinez* explained "the basis of liability is the defendant's knowledge of and *failure to prevent* the work from occurring" *Id.* at 70. In *Martinez*, seasonal agricultural workers who worked for a strawberry farmer brought an action against a produce merchant and others seeking to recover unpaid minimum wages. The workers argued that the produce merchant knew they were working and that the produce merchant benefitted therefrom. The court, however, held that the produce merchant did not allow the agricultural workers "to suffer" or "permit them to work" because the produce merchant did not have the power to prevent the workers from working. Therefore, the produce merchant was not responsible for unpaid minimum wages. But here, Corrigan and Lomarey were in a different position than the produce merchant in *Martinez* because they knew from Tikker's submisions that the plaintiffs were working overtime hours, were not being given wage statements and were not having required payroll deductions taken. Since Lomarey itself was making the wage

TENTATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND REQUEST FOR FURTHER BRIEFING
C-09-02013

payments on the project for its own and its Plan's benefit and Corrigan, acting for them, authorized the payment procedure and had ultimate control of the funds, Corrigan suffered plaintiffs to work without overtime pay or wage statements. Corrigan had the authority to control payment and ensure that plaintiffs were not required to work overtime or were paid the appropriate overtime wages. Therefore, Lomarey and its Plan, along with Tikker, were employers of plaintiffs under the "to suffer" or "permit them to work standard."

Although Corrigan set up the payment procedure on behalf of Lomarey and the Plan, he did so in his capacity as an officer or agent of Lomarey and the Plan and thus has no personal liability for the failure to pay plaintiffs their overtime wages. *See Reynolds v. Bement*, 36 Cal. 4th 1075, 1087-88 (2005) overruled on other grounds in *Martinez v. Combs*, 49 Cal. 4th at 64-66[2]. In *Reynolds* the California Supreme Court held that a corporate director, officer or agent could not be held responsible for an employee's wages even if he exercised control over the employee's wages, hour or working conditions. *Id.* *[The court requests further briefing on whether Lomarey or the Lomarey Plan or both and Corrigan are plaintiffs' employers under California law.]*

**3. Security Presence**

Neither side has presented authority that addresses whether Jaime, when providing a security presence at the apartment complex during the night, was working as an employee of Tikker or Lomarey or both as an independent contractor. If Jaime worked as a night watchman or security guard whose job required him to make rounds periodically and be awake at all times so that he could discourage or prevent theft and vandalism, he would probably be considered Tikker's employee. However, despite Jaime's testimony, that is not what it appears he was hired to do or did, in fact, do. Rather, Jaime provided a presence by physically being at the complex, making a couple of passes through the complex and leaving a light on during the night. Tikker wanted a presence at the complex during the night, but was not concerned as to the means by which it was accomplished.

---

[2] Although *Martinez* did not expressly deal with the issue of a corporate manager's responsibility for unpaid wages of an employee, the expanding of the meaning of "to employ" may suggest that the California Supreme Court would hold that a corporate manager responsible as an employer for unpaid wages in circumstances where the manager had power to control the employee's compensation.

TENTATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND REQUEST FOR FURTHER BRIEFING
C-09-02013

The evidence suggests that Jaime was acting as an independent contractor in providing this service for Tikker. *See* Cal. Labor Code § 3353. Tikker's payments of $75.00 per day compensated Jaime for his presence at the apartment complex during the night.

### 4. Overtime Wages Due Under State Law

Tikker did not keep time records or other records that show the hours worked by plaintiffs or the dates on which they worked on particular projects. Tikker apparently accepted the time records kept by Jaime, at least at the beginning of Jaime's employment with Tikker. However, Tikker believes that Jaime inflated his hours on the later records. But since defendants kept no records of the plaintiffs hours, the burden to show the hours worked by plaintiffs were other than those claimed by plaintiffs falls on defendants.

> One long-standing application of burden-shifting occurs in the wage-and-hour context when an employer's compensation records are so incomplete or inaccurate that an employee cannot prove his or her damages. When the United States Supreme Court addressed this problem with regard to claims under the Fair Labor Standards Act of 1938 . . . , it observed that the remedial nature of the statute and public policy "militate against making [the evidentiary burden] an impossible hurdle for the employee." (*Anderson v. Mt. Clemens Pottery Co.* (1946) 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515 (*Anderson*).) Considering that an employer has a statutory duty to maintain proper records of wages, hours and work conditions and is in the best position to know salient facts about the nature and amount of work performed, the court concluded it is appropriate to shift the burden of proof to the employer. ( *Id.* at pp. 687–688, 66 S.Ct. 1187.). Specifically, once an employee proves he or she "has in fact performed work" that was improperly compensated, and presents enough evidence to allow an inference as to the amount of this work, the burden shifts to the employer to prove the precise amount of work performed or to negate the inference drawn from the employee's evidence. (*Ibid.*) The high court observed that applying the normal burden of proof in such circumstances would unfairly penalize an employee for the employer's failure to keep proper records and would allow the employer to keep the benefits of the employee's labors without paying full compensation.

*Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1189 (2008).

Defendants provided two summary printouts–apparently from the joint office of Corrigan and Lomarey–reflecting payments to plaintiffs. Corrigan could not explain how they were prepared or offer evidence that supported their accuracy. One entitled "Vendor Quick Report" appears to show payments to Jaime for labor he provided on a house Corrigan and Tikker built. The other report, another Vendor Quick Report, shows payments to both plaintiffs and appears to reflect compensation for construction labor performed on the Lomarey apartment complex. The report

TENTATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND REQUEST FOR FURTHER BRIEFING
C-09-02013

11

purports to show payments totaling $57,047.00 to Jaime Lazaro and $19,714.00 to Edgar Lazaro. Although these printouts were admitted into evidence without objection, they shed little light on the total hours worked by plaintiffs and are clearly incomplete.

In determining the overtime hours worked, the court relies heavily on Jaime's records despite some discomfort with them. However, if defendants had kept records as required by law, the issue regarding the number of hours worked could be easily resolved. According to Jaime's calendar record, Jaime worked a total of _____ hours of overtime under California law and _____ under federal law. *[Fill in numbers of hours]* These figures do not include overtime at ten hours per day between June 17, 2007 and September 14, 2007 for his security presence. The court does not find that these hours are properly included in overtime. In addition, some of Jaime's overtime appears to have been for Tikker's personal projects in which Corrigan was not involved. Finally, the court is not persuaded that Jaime is entitled to any overtime pay from defendants for any hours worked prior to January 1, 2006. Labor provided before January 1, 2006 appears to have been done primarily for DPC Construction, who is not a party to this suit. Moreover, DPC is not a party for whom the court is persuaded that Jaime put in overtime hours. Claims for unpaid overtime wages under the Labor Code are governed by a three-year statute of limitations provided by California Code of Civil Procedure § 338(a). However, since plaintiffs can recover their unpaid overtime wages as restitution under Business & Professions Code §§ 17200 *et seq.*, they get the benefit of its four-year statute of limitations. Nevertheless, under California Labor Code § 510, the court calculates their overtime wages due for the three years prior to the filing of their complaint as follows: *[The court requests each party calculate the overtime wages for Jaime and Edgar with citations to the specific evidence that supports the calculations. Separate calculations should be done for Tikker, Lomarey and Corrigan (assuming he was an employer).]*

**B. Second Count—Liquidated Damages Under the FSLA**

    **1. Liquidated Damages Under the FLSA**

Plaintiffs seek liquidated damages under the Fair Labor Standards Act ("FSLA"). Under the FSLA, an employer who fails to pay overtime wages is liable to the employee affected in the amount

of his or her unpaid overtime compensation **"and in an additional equal amount as liquidated damages**." 29 U.S.C. § 216 (b) (emphasis added). The statute of limitations is two years unless the violation was willful. In the case of a willful violation, the limitation period is three years. Plaintiffs claim that they are entitled to go back three years to calculate liquidated damages because defendants' failure to pay overtime wages was willful. *See* 29 U.S.C. § 255.

### 2. Willfulness

A violation of the FLSA is willful if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA. *Chao v. A-One Medical Services*, 346 F.3d 908, 918 (9th Cir. 2003). The burden is on the employee to show willfulness. *Young v. Cooper Cameron Corp.,* 586 F.3d 201, 207 (2nd Cir. 2009).

Little evidence was presented on the issue of willfulness. That said, the defendants worked in or with the construction industry for a number of years and appear to have known the requirement to pay overtime. Moreover, the defendants had seen checks showing hours worked and rates of pay (e.g. DPC wage statements). Given defendants' background and experience, it seems highly likely that they either knew of their obligation to pay for overtime or, if they did not know, were reckless in the disregard for their obligations under the FLSA.

### 3. Employer Under Federal Law

Federal law provides that "'[e]mploy' includes to suffer or permit to work." 29 U.S.C. § 203 (g). However, there is a dearth of authority interpreting that language under federal law. Given that the statute should be interpreted liberally to promote the statutory purpose of protecting workers, an interpretation similar to that given by the California Supreme Court seems appropriate. *See Walling v. Wolff*, 63 F.Supp 605, 607-8 (D.C.N.Y. 1945). There also appears to be a lack of express authority holding one way or the other on the question of whether an officer of a company who has authority over an employee's hours can be held personally liable for the failure to pay overtime wages. *[The parties are requested to brief the question of whether Corrigan as an officer and director of Lomarey was an "employer" under federal law—it appears that under 29 U.S.C. § 203(g) he may be.]*

TENTATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND REQUEST FOR FURTHER BRIEFING
C-09-02013
13

**4. Calculation of Liquidated Damages**

*[Each party is requested to calculate the liquidated damages (amount of unpaid overtime wages) for Jaime and Edgar with citations to the specific evidence that supports the calculation.]*

**C. Third Count—Restitution Under California Business & Professions Code totaling § 17200**

**§ 1. Restitution of Wages for Business Practice of Failing to Pay Overtime Wages**

Plaintiffs seek their unpaid overtime wages for the four years prior to the filing of their complaint under California Business & Professions Code § 17208, which provides a four year statute of limitations as opposed to the three year statute governing California Labor Code violations. Defendants' failure to pay overtime wages was clearly a business practice. Therefore, plaintiffs are entitled to the overtime wages they earned during the four years prior to the filing of the complaint.

> We recognize that any business act or practice that violates the Labor Code through failure to pay wages is, by definition (§ 17200), an unfair business practice. It follows that an action to recover wages that might be barred if brought pursuant to Labor Code section 1194 still may be pursued as a UCL action seeking restitution pursuant to section 17203 if the failure to pay constitutes a business practice.

*Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 178-79 (9th Cir. 2000).

**2. Calculation of Restitution**

*[The court requests that each party calculate this restitution for the unpaid overtime wages for Jaime and Edgar with citations to the specific evidence that supports the calculations. Separate calculations should be done for Tikker, Lomarey and Corrigan (assuming he was an employer).]*

**D. Fourth Count—Compensation for Missed Mealtime Under California Labor Code § 226.7**

Plaintiffs claim that they were not always afforded at least a thirty minute meal period each day that they worked. California Labor Code § 512(a) requires that "[a]n employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes." The employer must pay the employee one additional hour of pay at the employee's regular rate for each day that a meal period is not provided. Cal. Labor Code § 226.7(b). Since defendants kept no records of meal breaks and plaintiffs offered some testimony, albeit not very convincing, that they did not always get their full lunch periods, the

TENTATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND REQUEST FOR FURTHER BRIEFING
C-09-02013
14

burden shifts to Tikker to come forward with evidence that an appropriate meal period was provided. *See, e.g., Solis v. Best Miracle Corp.*, 709 F. Supp.2d 843, 850 (C.D. Cal 2010). Tikker testified that he gave the plaintiffs an hour for lunch which they could take when they wanted and that plaintiffs' routine was to go to his house and watch a particular Spanish soap opera on televison. Tikker's testimony concerning lunch periods was more credible than plaintiffs' testimony. Plaintiffs claim that sometimes they were allowed thirty minutes for lunch and at other times an hour, but also claim that whatever time they were given was sometimes cut short. There is no evidence that they ever complained during their employment about the inadequacy of the meal period, although, in fairness, they may not have known about their legal entitlement to a minimum of thirty minutes. Although Tikker's lack of records placed a burden on him to come forward with evidence that appropriate meal periods were provided, his testimony sufficiently met that burden, especially given the weakness and lack of credibility of plaintiffs' testimony.

**E. Fifth Count—Waiting Time Penalties Under California Labor Code § 203**

Plaintiffs each seek a penalty under California Labor Code § 203 for the willful failure to pay overtime wages due at the time of the termination of their employment. Section 203 provides in part that "[i]f an employer willfully fails to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days." Defendants failure to pay was clearly willful. "The term 'wilful', as it is used in section 203 of the Labor Code, does not mean that the refusal to pay wages must necessarily be based on a deliberate evil purpose to defraud workmen of wages which the employer knows to be due, in order to subject him to the penalty . . . . [T]he term 'wilful' in its ordinary use, merely means that one intentionally fails or refuses to perform an act which is required to be done." *Davis v. Morris*, 37 Cal.App. 2d 269, 274 (1940). The penalties to which plaintiffs are entitled are calculated as follows:

Jaime Lazaro: *[Parties are to calculate with citations to specific evidence.]*

Edgar Lazaro: *[Parties are to calculate with citations to specific evidence.]*

TENTATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND REQUEST FOR FURTHER BRIEFING
C-09-02013
15

### F. Sixth Count—Inadequate Wage Statements Under California Labor Code § 226

Plaintiffs also each seek a penalty under California Labor Code § 226 because they were provided with inadequate wage statements. Section 226(a) requires an employer to semi-monthly furnish at the time each payment of wages is made a wage statement showing, among other things, the gross wages earned, the total hours worked, all applicable hourly rates and deductions. This was not done. Section 226(e) entitles an employee who suffers injury from the knowing and intentional failure to comply with section 226(a) to $50 for the initial pay period in which a violation occurs and $100 for each subsequent violation up to a maximum of $4000.

The evidence supports the conclusion that plaintiffs were injured by the violations. The injury stemming from the section 226(a) violations is evidenced by the active dispute regarding overtime hours and pay that has occurred between the parties. *See Wang v. Chinese Daily News, Inc.*, 435 F.Supp. 2d 1042, 1050 (C.D. Cal. 2006) ("[T]his lawsuit, and the difficulty and expense Plaintiffs have encountered in attempting to reconstruct time and pay records, is further evidence of the injury suffered as a result of [defendant's non-compliant] wage statements."). It is defendants' failure to provide plaintiffs with accurate and complete records of their overtime hours that prevented defendants from paying plaintiffs what they were due and perhaps avoiding this lawsuit. Indeed, this appears to be the type of injury envisioned by section 226(e). The facts here contrast with those in *Villacres v. ABM Indus. Inc.*, 384 Fed. Appx. 626 (9th Cir. 2009) where the court found no injury. In that case, the plaintiff "conceded at his deposition that he experienced no harm as a result of the employer's alleged failure of section 226(a)" and argued "that violations of section 226(a) in and of themselves are injuries sufficient to make section 226(e) relief available." *Id.* at 627. There was not a dispute, as here, as to the overtime hours worked and the entitlement to overtime pay.

Tikker, Lomarey and Corrigan violated the requirements of section 226(a) by their knowing and intentional failure to furnish Jaime and Edgar with the required wage statements semimonthly or each time Jaime and Edgar were paid their wages. Therefore, Jaime is entitled to *[fill in total amount owed Jaime under Labor Code § 226]* calculated as follows: *[fill in number of Jaime's pay*

*periods in which a violation occurred and evidence that supports a violation for each pay period (there appear to have been approximately 35 violations)]*. Edgar is entitled to *[fill in total amount owed Edgar under Labor Code § 226]* calculated as follows: *[fill in number of Edgar's pay periods in which a violation occurred and evidence that supports a violation for each pay period (there appear to have been approximately 10 violations)]*.

## III.
## ENTITLEMENT TO JUDGMENT

Based upon the Findings of Fact and Conclusion of Law set forth above, Jaime Lazaro is entitled to judgment as follows: *[Set forth proposed form of judgment which should include amount to be recovered against each defendant and the portion of that amount which is joint with the other defendants.]* Edgar Lazaro is entitled to judgment as follows: *[Set forth proposed form of judgment which should include amount to be recovered against each defendant and the portion of that amount which is joint with the other defendants.]*

## FURTHER BRIEFING

Plaintiffs are to file revised proposed Findings of Fact and Conclusions of Law and a supporting brief within 20 days of this order. Defendants are to file their revised proposed Findings of Fact and Conclusions of Law and supporting brief within 15 days after the deadline for plaintiffs' papers. Plaintiffs may file a reply to defendants' papers within 10 days after the deadline for defendants' papers. Each side's proposed revised Findings of Fact and Conclusions of Law should be the court's Tentative Findings of Fact and Conclusions of Law with any proposed revisions highlighted. Proposed revisions need not be limited to those portions where the court has indicated the need for additions but any proposed revision or addition must be supported by citations to the evidence. The amounts that each side claims should be awarded against each defendant as damages or as restitution must, in addition to being supported by detailed citations to the evidence, set forth the method used to calculate the amount.

The accompanying briefs should address the issues previously identified, as well as any factual finding or conclusion of law that a party believes is incorrect or otherwise needs revision.

TENTATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND REQUEST FOR FURTHER BRIEFING
C-09-02013

Moreover, the court specifically requests that the parties address, in addition to what has already been requested:

    1. whether plaintiffs can recover liquidated damages under the FSLA as well as penalties owed under the California Labor Code;

    2. what evidence admitted at trial is there that supports a claim that either Jaime or Edgar worked for DPC after Jaime was fired by Poncabare, and, if so, how does that effect the damages or restitution claimed by each since DPC is not a named party?

    3. Do defendants claim that the Federal Labor Standards Act does not apply to defendants? If so, explain the basis (in his opening statement, defense counsel stated that the federal claim (Count Two) requires an employer to meet a certain size criteria which Tikker did not meet. To what law was defense counsel referring?

DATED: 06/22/2011

                                                            RONALD M. WHYTE
                                                            United States District Judge