1

2

3

4                                              **E-FILED on** _2/21/12_____

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                              SAN JOSE DIVISION

11

| | |
|---|---|
| 12   EDGAR JEHOVANI LAZARO and JAIME LAZARO, | No. C-09-02013 RMW |
| 13            Plaintiffs, | |
| 14        v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| 15   LOMAREY INC., PATRICK CORRIGAN, JARED TIKKER, | |
| 16 | |
| 17            Defendants. | |
| 18 | |
| 19 | |

20        This matter was tried before the court beginning on November 15, 2010 and concluding on

21   November 16, 2010.  Plaintiffs Edgar Lazaro and Jaime Lazaro were represented by Adam Pedersen

22   and Adam Wang of the Law Offices of Adam Wang.  Defendants Lomarey, Inc., Patrick Corrigan,

23   Vision Builders and Jared Tikker were represented by Edward Newman of Newman, Marcus &

24   Clarenbach, LLP.  Plaintiffs seek recovery of wages and penalties for overtime hours they claim

25   they worked but for which they were only paid their regular hourly rates.  The main issues are: (1)

26   who was the employer or employers of each of the plaintiffs, (2) how many overtime hours did each

27

28

Findings of Fact and Conclusions of Law
C-09-02013

United States District Court
For the Northern District of California

plaintiff work, and (3) what are the remedies to which each plaintiff is entitled.  The court's Findings of Fact and Conclusions of Law are set forth below.

# I.  FINDINGS OF FACT

### A.  Parties

1.  Plaintiffs Jaime Lazaro ("Jaime") and Edgar Lazaro ("Edgar") (collectively the "Lazaros") were construction workers hired by defendant Jared Tikker ("Tikker"), who did business as Vision Builders.  Before working for Tikker, Jaime worked as a construction laborer for DPC Construction ("DPC").  Edgar is Jaime's nephew.

2.  Lomarey, Inc. ("Lomarey") was a corporation whose primary business was private money lending.  According to Patrick Corrigan ("Corrigan"), Lomarey's principal, Lomarey assisted its Pension and Profit Sharing Plan ("Plan") in building an apartment complex.  Corrigan testified that the funding for that project came from the Plan but was run through Lomarey as the Plan had a limit on the number of checks it could write.  He indicated that the Plan was formed for the benefit of Lomarey employees and for him and his wife.

3.  DPC was a joint venture of Corrigan and Daniel Poncabare ("Poncabare").  Corrigan was apparently the source of funds for DPC's projects and Poncabare supervised the construction work as general contractor.  Tikker worked for DPC starting in 2002 or 2003.  Jaime worked for DPC starting in 2004.  Jaime was paid as an employee of DPC with his payroll checks showing hours worked, employee deductions and withholding.

4.  Although Tikker was a licensed general contractor, he carried no worker's compensation insurance, kept no records pertaining to his employees, provided no wage statements to the Lazaros during the time that they worked for him and did not take required payroll deductions from their pay.  He apparently represented to the Contractors Licensing Board that Vision Builders had no employees.  Corrigan, on behalf of Lomarey, hired Vision Builders (Tikker) on "a handshake" as the general contractor for construction of an apartment complex.  No written evidence was offered showing the relationship among Tikker, Vision Builders, Lomarey, the Plan and Corrigan.  The testimony from Tikker and Corrigan on the subject was vague and lacking in detail.  Tikker did not

Findings of Fact and Conclusions of Law
C-09-02013

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    distinguish between Lomarey and its Plan in his testimony.  In fact, he referred to Lomarey as the

2    owner of the project and never mentioned the Plan.  Tikker referred only to Lomarey when

3    discussing the procedure for payment of the construction workers on the apartment complex.

4    Similarly, defense counsel referred to Tikker as working on two projects during the relevant time

5    period, one for Corrigan and the other for Lomarey.  What's more, defense counsel made no mention

6    of the Plan in his opening statement, the Pretrial Conference Statement or the defendants' proposed

7    Findings of Fact and Conclusions of Law.  In addition to doing construction work for Lomarey,

8    Tikker was a Lomarey real estate sales agent operating under Corrigan's broker's license.  He sought

9    borrowers for Lomarey's trust deed investment business and also did some property inspections.

10   Tikker apparently received a commission on any loan transaction he brought to Lomarey.

11        5.   Corrigan was the sole principal of Lomarey and its licensed real estate broker.  He was

12   responsible on behalf of Lomarey for the apartment complex project.  Corrigan and Tikker had been

13   friends for several years at the time Corrigan hired Tikker to be the general contractor on the

14   apartment complex project.  Tikker received a flat fee of $80,000.00 for his work as the general

15   contractor on the project.  Corrigan also personally formed a joint venture with Tikker to remodel a

16   home and build a new residence on an adjacent property.  Corrigan and Tikker split their profits on

17   that project.  Corrigan also funded the construction of a new home for Tikker on property which was

18   in Corrigan's name.  Upon completion, Tikker was to put the home in his name and obtain a

19   permanent loan.  Whether Tikker did so was not addressed.  Corrigan received no fee or

20   compensation for his role in the Tikker residence project—he merely did this as an accommodation

21   for his friend.  The evidence was not clear as to whether Corrigan and Tikker did other construction

22   projects together.

23        **B. Tikker's Hiring of Jaime and Edgar Lazaro and the Work They Performed**

24        6.   Tikker met Jaime in approximately 2004 when they both worked for DPC doing

25   construction work.  Jaime was paid for his work as an employee of DPC with checks signed by

26

27

28

Findings of Fact and Conclusions of Law
C-09-02013

3

United States District Court
For the Northern District of California

1    Corrigan and written on DPC's payroll account.[1]   The DPC checks issued to Jaime for his labor

2    included wage statements showing his hours, rate of pay, withholding, social security and other

3    required employee deductions.  Sometime in 2005, Poncabare fired Jaime.  Thereafter, according to

4    Tikker—the evidence suggests around July 2005—Tikker hired Jaime as a construction worker

5    because Tikker was about to begin work as the general contractor on the Lomarey apartment

6    complex project and needed construction laborers.  However, according to a document entitled

7    "Patrick Corrigan Vendor Quick Report All Transactions," Jaime first did work on a residential

8    remodel and new construction project Corrigan and Tikker were doing.  Starting in approximately

9    October 2006, Jaime worked primarily, but not exclusively, on the Lomarey apartment complex

10   project.  Some DPC payroll checks were introduced that purportedly show payment to Jaime for

11   labor performed in late October 2007 for DPC.  No explanation was given as to whether these

12   checks were actually for work on a DPC project.  No one testified that Jaime had been rehired by

13   DPC after being fired or that he ever worked on a DPC project after he was fired.

14           7. Jaime worked for Tikker (Vision Builders) starting in approximately July 2005.  Tikker

15   was solely responsible for Jamie's hiring and firing.  Jaime testified that when he was hired, Tikker

16   said that he (Jaime) was being hired on behalf of Lomarey and that is for whom Jaime thought he

17   was working.  At the time Jaime was hired, Tikker apparently gave Jaime his Lomarey real estate

18   sales agent business card.  Jaime did construction work as directed by Tikker until Tikker fired him

19   on November 9, 2007 because Jaime appeared to be exaggerating the number of hours he worked.

20   No explanation was given as to why Tikker would be firing Jaime if he (Jamie) was back working

21   for DPC.  The evidence is not entirely consistent as to which projects Jaime worked on and who was

22   responsible for those projects.  However, it appears that Jaime was paid with Vision Builder's checks

23   for labor on Tikker's personal projects, with Lomarey checks for labor on the apartment complex

24   and with checks on Corrigan's personal account for labor on projects Tikker (Vision Builders) and

25

26

27

28   [1]  Jaime Lazaro may have also been paid for his work for DPC by checks written on Poncabare's
     personal bank account.

Findings of Fact and Conclusions of Law
C-09-02013

4

United States District Court
For the Northern District of California

1    Corrigan did personally.[2]  There was no testimony explaining why some payments were made by

2    DPC to Jaime for work purportedly done in late 2007.

3          8.  Edgar periodically worked for Tikker (Vision Builders) from April 30, 2007 to November

4    9, 2007.  In approximately April 2007, Edgar asked Jaime if Tikker had work for him (Edgar).  At

5    that time, Jaime and Tikker were working on the Lomarey apartment complex.  Edgar was employed

6    when additional construction work needed to be completed.  Tikker was solely responsible for

7    Edgar's hiring.  Edgar testified that Tikker told him he would be working for Lomarey.  Most of

8    Edgar's paychecks came from Lomarey, but some came from DPC.  Jaime and Edgar claim that after

9    Edgar was hired, he worked the same hours as did Jaime.  However, a document entitled "Lomarey

10   Vendor Quick Report All Transactions" which purports to show payments to Jaime and Edgar for

11   work on the Lomarey project indicates that Edgar only worked about seventy to seventy-five percent

12   of the hours worked by Jaime.  There was no testimony explaining why some wage payments were

13   made to Edgar by DPC or stating that DPC ever employed Edgar.  Tikker terminated Edgar's

14   employment on November 9, 2007.

15        **C.  Assignment and Supervision of Work**

16        9.  Corrigan and Tikker (Vision Builders) described their business relationship as that of

17   owner (Lomarey on the apartment complex and Corrigan on his personal projects) and general

18   contractor (Tikker).  The apartment complex project was funded through a construction loan

19   obtained by either Lomarey or its Plan.  The evidence is not clear as to which entity actually took

20   out the loan, but the funds were dispersed through Lomarey's checking account since, according to

21   Corrigan, the Plan was limited on the number of checks it could write.  The cost breakdown required

22   by the bank for the construction loan was apparently prepared by Tikker.  Most, if not all, payments

23   for the Lazaros' labor on the apartment complex were made by Lomarey with checks signed by

24   Corrigan.  These checks did not include wage statements showing overtime hours.  Although

25   Corrigan claimed he knew nothing about how the construction laborers were paid, his signature was

26   _____

27   [2]  Although there is some inconsistency between the testimony and the documentary evidence as to
     when Jaime was working for Lomarey and when he worked on other projects, the court has allocated

28   the hours primarily based upon the source of the payment.

Findings of Fact and Conclusions of Law
C-09-02013

1   on the Lomarey checks and he must have recognized, or at least his staff in charge of payroll must

2   have recognized, that neither his office nor Tikker was causing the required payroll deductions to be

3   taken and that overtime work was neither tracked nor paid for at overtime rates. Corrigan was a

4   sophisticated developer, as he acknowledged that he had been doing projects for twenty-five years.

5       10.  Corrigan was not involved in the day-to-day construction activities and claims he never

6   met Jaime until sued in this litigation and has never met Edgar.

7   **D. Work Performed and Payment of Salaries**

8       11.  No one except Jaime kept purportedly complete records of the hours that the Lazaros

9   worked on the Lomarey apartment complex project or other projects in which Corrigan or Tikker

10  participated.  Jaime kept track of his hours in a notebook and at least for a period of time reviewed

11  those hours with Tikker before Tikker caused him to be paid for his work.  At least on the apartment

12  complex project, Tikker would verbally authorize the Lomarey office to issue checks for the hours

13  the Lazaros worked.  Corrigan instructed his office at the beginning of the apartment project that

14  checks were to be issued on Tikker's authorization.  Corrigan signed the checks.  This same

15  procedure was apparently followed with the other projects on which Jaime Lazaro worked, except

16  that payment was made by Corrigan or Tikker, depending on the particular project.  No wage

17  statements showing overtime hours were prepared.  There were some checks for labor written in late

18  2007 on DPC's account.  No evidence was introduced explaining the reason those checks were

19  written on DPC's account.

20      12.  Although Jaime's testimony and records concerning his work hours are suspect,

21  particularly toward the later stages of his employment, those records are the only evidence presented

22  that purports to capture all the hours worked by the Lazaros.  Some cancelled checks and other pay

23  records office reflecting payments to plaintiffs, including two Vendor Quick Reports apparently

24  prepared by an accounting staff person in the Corrigan/Lomarey office, were admitted without

25  objection.  Corrigan, however, could not explain how the Quick Reports were prepared or offer

26  verification supporting their accuracy or completeness.  One entitled "Patrick Corrigan Vendor

27  Quick Report All Transactions" appears to itemize checks paid to Jaime in the total amount of

28  $15,478.00 for labor he provided from July 22, 2005 to December 15, 2006 on a house Corrigan and

Findings of Fact and Conclusions of Law
C-09-02013

**United States District Court**
For the Northern District of California

1   Tikker built.  The other report entitled  "Lomarey Inc. Vendor Quick Report All Transactions"

2   purports to list checks paid to Jaime Lazaro from October 13, 2006 to September 14, 2007 and to

3   Edgar Lazaro from May 13, 2007 to September 14, 2007, presumably for wages for construction

4   labor performed on the Lomarey apartment complex.  The Lomarey Quick Report shows payments

5   totaling $57,047.00 to Jaime Lazaro and $19,714.00 to Edgar Lazaro.  Taking the portions of the

6   report that list payments to the Lazaros over the same period of time and adjusting for the higher

7   hourly rate that Jaime received, it appears that Edgar worked about seventy to seventy-five percent

8   of the hours Jaime worked.  Although these Vendor Quick Reports were admitted into evidence

9   without objection and the contents not directly challenged by plaintiffs, it is unclear as to whether

10  they reflect the total hours worked by plaintiffs during the identified time periods.  However, the

11  reports do support the conclusion that Edgar worked fewer days than Jaime during the time period

12  when they both worked on the Lomarey project.  This is consistent with Tikker's testimony that

13  Edgar only came to work when he was needed and did not come every day.

14          13.  Jaime's rate of compensation was $12 per hour from May 6, 2006 to September 15,

15  2006, $13 per hour from September 17, 2006 to March 6, 2007 and $16 per hour from March 7,

16  2007 to November 9, 2007.  Edgar's hourly rate was $12 per hour for the entire period of his

17  employment.

18          14.  As a result of some break-ins at the apartment complex project, Tikker considered hiring

19  a security company to make a couple of passes through the project site during the night.  The

20  security company quoted a charge of $75.00 per day for the service.  According to Tikker, he offered

21  the job to Jaime because Jamie needed money to address some personal issues.  At the time, Jaime

22  was staying at Tikker's residence.  Jaime took the security job and stayed in one of the units at the

23  complex overnight after eating, showering and watching TV at Tikker's house.  Tikker testified that

24  Jaime took a mattress from Tikker's home to sleep on and would leave a light on in one of the units

25  at the complex to show presence.  He would return to Tikker's house in the morning to shower and

26  eat breakfast, if he wished to do so, before going to work.  Jaime testified to a different version of

27  the experience.  He claimed that he was not given a mattress and did not stay in a unit.  Instead,

28  Jaime claimed he made several rounds of the complex during the night.  He did not sleep, but

Findings of Fact and Conclusions of Law
C-09-02013

**United States District Court**
For the Northern District of California

occasionally sat in his car because it was more comfortable. Jaime's testimony that he made several rounds during the night and did not sleep was not credible. The credible testimony was that Jaime agreed to and did stay in one of the unfinished units of the apartment complex to show a presence in order to discourage break-ins. This job lasted from approximately June 17, 2007 to September 14, 2007. It was not part of Jaime's job as a construction worker, but rather, a separate job he elected to take. The job required him to provide some presence at the job site. His work in this regard was not supervised, nor was he given any instructions as to how to perform the job except to leave a light on in one of the units and make a couple of passes through the units. Jaime was paid $75.00 per day for this service.

15. The Lazaros claimed that they were sometimes allowed one-half hour lunch breaks and at other times one-hour lunch breaks. Regardless, the Lazaros claim that even the one-half hour breaks were sometimes cut short. Whatever the period of the lunch break, Jaime claims it was deducted from the hours kept by him. According to Tikker, the Lazaros were given a one-hour lunch break for which they were not paid. An hour was deducted from their hours each day for their lunch period, regardless of the time actually taken for lunch. The Lazaros typically watched a Hispanic soap opera at Tikker's house during lunch. Tikker denied that the Lazaros were ever refused a full lunch period. Tikker's explanation of what the workers generally did during their authorized one-hour lunch was more persuasive than the Lazaros' testimony that they often did not get even thirty minutes for lunch. It appears that the employees were basically free to take a one hour lunch period as they saw fit.

16. In determining the number of overtime hours worked, the court has accepted Jaime's records as essentially accurate but has discounted the total overtime hours claimed by approximately ten percent to take into account exaggeration of hours. The conclusion that the overtime hours are exaggerated is based upon the testimony of Tikker and Jaime as to the pay procedure wherein the number of hours were agreed upon at least for some period of time, doubts as to the credibility of some of Jaime's testimony, particularly regarding lunch breaks, and the contents of the Quick Reports. However, since Tikker failed to maintain required employment records to show the actual overtime worked, the court has minimized the discount from the hours claimed by the Lazaros.

Findings of Fact and Conclusions of Law
C-09-02013

Although Jaime worked more than eight hours per day and forty hours per week, he was not paid overtime because, according to Tikker, he was paid an above market hourly rate and was provided housing, tools, meals and a vehicle.  Defendants, however, do not assert that Jaime's overtime was compensated by his acceptance of housing, tools or a vehicle and no credit against overtime pay due has been taken for the alleged receipt of these benefits. The court estimates the overtime hours worked by Jaime and Edgar as follows:

| Plaintiff | Work Dates | Overtime Hours | Regular Rate of Pay | Project on Which Labor Provided |
|---|---|---|---|---|
| Jaime Lazaro | 01/01/06-05/05/06 | 450 | $12/hour | Tikker project(s): 125 hours<br><br>Corrigan and Tikker joint project(s): 325 hours |
| | 05/06/06-9/15/06 | 575 | $12/hour | Corrigan and Tikker joint project(s): 575 hours |
| | 9/16/06-3/6/07 | 550 | $13/hour | Corrigan and Tikker joint projects: 60 hours<br><br>Lomarey: 490 hours |
| | 3/7/07-11/9/07 | 625 | $16/hour | Lomarey |
| Edgar Lazaro | 4/30/07-11/9/07 | 450 | $12/hour | Lomarey |

16. The total hours for Jaime do not include the 890 hours that he claims to have worked as a night watchman at the Lomarey project.

17.  The Lazaros filed this action on May 6, 2009.

## II.   CONCLUSIONS OF LAW

**A.  First Count—Unpaid Overtime Wages (California Labor Code § 510)**

**1.  Nature of Claim**

1    Plaintiffs Jaime and Edgar Lazaro claim that they were only paid their regular rates for their

2    work in excess of eight hours per day and not one and one-half times their regular rates of pay as

3    required by California Labor Code § 510. A laborer is entitled to overtime wages for any work in

4    excess of eight hours in one workday and any work in excess of 40 hours in any one work week

5    compensated at the rate of no less than one and one-half times the regular rate of pay for the worker.

6    *Id.* Plaintiffs claim that Tikker (Vision Builders), Lomarey and Corrigan are all responsible for the

7    unpaid overtime wages. Defendants contend that only Tikker (Vision Builders) was plaintiffs'

8    employer and, therefore, is the only defendant responsible for payment of the overtime wages.

9        **2. Plaintiffs' Employer Under California Law**

10    The parties do not dispute that Tikker (Vision Builders) was plaintiffs' employer. The

11    disputed issue is whether Lomarey, Corrigan or both were also plaintiffs' employer and, if

12    so, with respect to which projects. Both sides rely on the recent opinion from the California

13    Supreme Court in *Martinez v. Combs*, 49 Cal. 4th 35 (2010) to support their positions. *Martinez*

14    discussed in detail three applicable definitions of "to employ" in analyzing who is an employer liable

15    for payment of minimum or overtime compensation under California Labor Code § 1194. California

16    Labor Code § 1194 provides that "any employee receiving less than the legal minimum wage or the

17    legal overtime compensation applicable to the employee is entitled to recover in a civil action the

18    unpaid balance of the full amount of this minimum wage or overtime compensation, including

19    interest thereon, reasonable attorney's fees, and costs of suit." The California Supreme Court in

20    *Martinez* held that "[t]o employ . . . has three alternative definitions. It means: (a) to exercise

21    control over the wages, hours or working conditions, or (b) to suffer or permit to work, or (c) to

22    engage, thereby creating a common law employment relationship." *Martinez*, 49 Cal. 4th. at 64.

23    Plaintiffs claim that the Lomarey and Corrigan employed plaintiffs under all three definitions.

24    Defendants claim that Lomarey and Corrigan did not employ plaintiffs under any of the definitions.

25    Although defendants' testimony concerning the relationship among Tikker, Lomarey and

26    Corrigan was limited and vague, the evidence offered supports the conclusion that the Lomarey

27    apartment construction project was a joint project of Tikker, Lomarey and its Plan, for which Tikker

28    was the general contractor and Lomarey or its Plan was the owner. The other projects in which

Findings of Fact and Conclusions of Law
C-09-02013

**United States District Court**
For the Northern District of California

Tikker and Corrigan were involved were partnerships or joint ventures.  As to those partnership or joint venture projects, both Tikker and Corrigan may have been the employer of Jaime under all three alternative definitions set forth in *Martinez* but, at a minimum, treated and paid Jaime under an arrangement similar to that they had with him for the Lomarey project.  As to the projects that Tikker did alone, only he was the employer.

With respect to the apartment complex project, the evidence as it stands does not show that Corrigan or Lomarey was an "employer" under definitions (a) and (c).  The essential question, therefore, is whether Corrigan or Lomarey allowed plaintiffs "to suffer or permit[ted them] to work." *Martinez* explained "the basis of liability is the defendant's knowledge of and *failure to prevent* the work from occurring" *Id.* at 70.  In *Martinez*, seasonal agricultural workers who worked for a strawberry farmer brought an action against a produce merchant and others seeking to recover unpaid minimum wages. The workers argued that the produce merchant knew they were working and that the produce merchant benefitted therefrom.  The court, however, held that the produce merchant did not allow the agricultural workers "to suffer" or "permit them to work" because the produce merchant did not have the power to prevent the workers from working.  Therefore, the produce merchant was not responsible for unpaid minimum wages.  But here, Corrigan and Lomarey were in a different position than the produce merchant in *Martinez* because they knew from Tikker's submisions that the plaintiffs were working overtime hours, were not being given wage statements and were not having required payroll deductions taken.  Since Lomarey itself was making the wage payments on the project for its own and its Plan's benefit and Corrigan, acting for Lomarey and its Plan and for himself and his wife as beneficiaries, authorized the payment procedure and had ultimate control of the funds, Lomarey permitted plaintiffs to work without overtime pay or wage statements.  Corrigan had the authority to control payment and ensure that plaintiffs were not required to work overtime or were paid the appropriate overtime wages.  Therefore, Lomarey and its Plan, along with Tikker, were employers of plaintiffs under the "to suffer" or "permit them to work" standard.

Although Corrigan set up the payment procedure on behalf of Lomarey and the Plan, he did so in his capacity as an officer or agent of Lomarey and the Plan and thus has no personal liability

Findings of Fact and Conclusions of Law
C-09-02013

1  for the failure to pay plaintiffs their overtime wages. *See Reynolds v. Bement*, 36 Cal. 4th 1075,

2  1087-88 (Cal. 2005) overruled on other grounds in *Martinez*, 49 Cal. 4th at 64-66[3]. In *Reynolds* the

3  California Supreme Court held that a corporate director, officer or agent could not be held

4  responsible for an employee's wages even if he exercised control over the employee's wages, hour or

5  working conditions. *Id.*

6      **3. Security Presence**

7          Neither side has presented authority that clearly addresses whether Jaime, when providing a

8  security presence at the apartment complex during the night, was working as an employee of Tikker,

9  Lomarey or both or as an independent contractor. If Jaime worked as a night watchman or security

10  guard and the job required him to take specific security measures and be awake at all times so that

11  he could discourage or prevent theft and vandalism, he would probably be considered Tikker's

12  employee. However, despite Jaime's testimony, that is not what it appears he was hired to do or, in

13  fact, did do. Rather, Jaime provided a presence by physically being at the complex, making a couple

14  of passes through the complex and leaving a light on in one of the units during the night. Tikker

15  wanted a presence at the complex during the night, but was not concerned as to the means by which

16  it was accomplished. The evidence suggests that Jaime was acting as an independent contractor in

17  providing this service for Tikker. *See* Cal. Labor Code § 3353. Tikker's payments of $75.00 per day

18  sufficiently compensated Jaime for his presence at the apartment complex during the night.

19      **4. Overtime Wages Due Under State Law**

20          Tikker did not keep time records or other records that show the hours worked by

21  plaintiffs or the dates on which they worked on particular projects. Tikker and Jaime apparently

22  agreed, at least at the beginning of Jaime's employment with Tikker, on the hours that Jaime worked,

23  after they reviewed the time calendar kept by Jaime. Tikker believes that Jaime inflated his hours on

24

25

26  [3] Although *Martinez* did not expressly deal with the issue of a corporate manager's responsibility for
    unpaid wages of an employee, the expanding of the meaning of "to employ" may suggest that the
27  California Supreme Court would hold that a corporate manager responsible as an employer for
    unpaid wages in circumstances where the manager had power to control the employee's
28  compensation.

Findings of Fact and Conclusions of Law
C-09-02013

1   the later records.  But since defendants kept no records of the plaintiffs' hours, the burden to show

2   that the hours worked by plaintiffs were other than those claimed by plaintiffs falls on defendants.

3
>   One long-standing application of burden-shifting occurs in the wage-and-hour
4   context when an employer's compensation records are so incomplete or inaccurate
>   that an employee cannot prove his or her damages.  When the United States Supreme
5   Court addressed this problem with regard to claims under the Fair Labor Standards
>   Act of 1938 . . . , it observed that the remedial nature of the statute and public policy
6   "militate against making [the evidentiary burden] an impossible hurdle for the
>   employee." (*Anderson v. Mt. Clemens Pottery Co.* (1946) 328 U.S. 680, 687, 66 S.Ct.
7   1187, 90 L.Ed. 1515 (*Anderson*).)  Considering that an employer has a statutory duty
>   to maintain proper records of wages, hours and work conditions and is in the best
8   position to know salient facts about the nature and amount of work performed, the
>   court concluded it is appropriate to shift the burden of proof to the employer. (*Id.* at
9   pp. 687–688, 66 S.Ct. 1187.).  Specifically, once an employee proves he or she "has
>   in fact performed work" that was improperly compensated, and presents enough
10  evidence to allow an inference as to the amount of this work, the burden shifts to the
>   employer to prove the precise amount of work performed or to negate the inference
11  drawn from the employee's evidence. (*Ibid.*)  The high court observed that applying
>   the normal burden of proof in such circumstances would unfairly penalize an
12  employee for the employer's failure to keep proper records and would allow the
>   employer to keep the benefits of the employee's labors without paying full
13  compensation.

14  *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1189 (Cal. Ct. App. 2008).

15      The evidence at trial included two summary printouts (Vendor Quick Reports)—apparently

16  from the joint office of Corrigan and Lomarey—reflecting payments to plaintiffs.  Corrigan could

17  not explain how they were prepared or offer convincing evidence that supported their accuracy.  One

18  appears to show payments to Jaime for labor he provided on a house Corrigan and Tikker built.  The

19  other report shows payments to both plaintiffs and appears to reflect compensation for construction

20  labor performed on the Lomarey apartment complex.  Although these printouts were admitted into

21  evidence without objection along with some cancelled checks and other records of wage payments,

22  they shed limited light on the total overtime hours worked by plaintiffs and may be incomplete.

23  However, plaintiffs did not directly challenge their contents.

24      In determining the overtime hours worked, the court relies heavily on Jaime's records despite

25  some discomfort with them.  If defendants had kept records as required by law, the issue regarding

26  the number of overtime hours worked could be easily resolved.  The court concludes that Jaime

27  worked approximately 1750 overtime hours from May 6, 2006 to September 17, 2007, the last day

28  the Lazaros appear to have worked on the Lomarey project.  These 1750 hours do not include the ten

Findings of Fact and Conclusions of Law
C-09-02013

hours per day between June 17, 2007 and September 14, 2007 that Jaime claims he worked as a security guard. The court finds that in providing these services, Jaime was working as an independent contractor and was fully paid by the $75.00 dollars per day he has previously received. In addition, some of Jaime's overtime appears to have been for Tikker's personal projects in which Corrigan was not involved. Finally, the court is not persuaded that Jaime is entitled to any overtime pay from defendants for any hours worked prior to January 1, 2006 or after September 14, 2007. Labor provided before January 1, 2006 and after September 14, 2007 appears to have been done for DPC, which is not a party to this suit.

Claims for unpaid overtime wages under the Labor Code are governed by a three-year statute of limitations provided by California Code of Civil Procedure § 338(a). However, since plaintiffs can recover their unpaid overtime wages as restitution under Business & Professions Code §§ 17200 *et seq.*, they get the benefit of its four-year statute of limitations. Nevertheless, under California Labor Code § 510, the court calculates their overtime wages due for the three years prior to the filing of plaintiffs' complaint as follows:

| Plaintiff | Work Dates | Overtime Hours | Regular Rate of Pay | Project | Amount of Overtime Pay Due |
|-----------|-----------|----------------|---------------------|---------|----------------------------|
| Jaime Lazaro | 05/06/06-09/15/06 | 575 | $12/hour | Tikker and Corrigan joint project(s): 575 hours | $3450.00 |
| Jaime Lazaro | 09/16/06-03/06/07 | 550 | $13/hour | Tikker and Corrigan joint project(s): 60 hours

Lomarey: 490 hours | $390.00

$3185.00 |
| Jaime Lazaro | 03/07/06-11/09/07 | 625 | $16/hour | Lomarey: 625 hours | $5000.00 |
| Edgar Lazaro | 04/30/07-11/09/07 | 450 | $12/hour | Lomarey: 450 hours | $2700.00 |

**B. Second Count—Liquidated Damages Under the FLSA**

**1. Liquidated Damages Under the FLSA**

Findings of Fact and Conclusions of Law
C-09-02013

1    Plaintiffs seek liquidated damages under the Fair Labor Standards Act ("FLSA").  Under the

2 FLSA, an employer who fails to pay overtime wages is liable to the employee affected in the amount

3 of his or her unpaid overtime compensation "*and in an additional equal amount as liquidated*

4 *damages.*"  29 U.S.C. § 216 (b) (emphasis added).  Overtime wages are due for hours worked in

5 excess of 40 in any work week.  *See* 29 U.S.C. § 207.  Federal law does not provide for the

6 alternative of calculating overtime based on hours worked in excess of eight per day as does

7 California state law.  However, the difference here between the calculations is de minimus.  The

8 statute of limitations is two years unless the violation was willful.   In the case of a willful violation,

9 the limitation period is three years.  Plaintiffs claim that they are entitled to go back three years to

10 calculate liquidated damages because defendants' failure to pay overtime wages was willful.  *See* 29

11 U.S.C. § 255.

12         **2.  Application of FLSA**

13    Defendants contend that they are not subject to the FLSA because plaintiffs were not

14 "engaged in commerce" in providing their construction labor and were not engaged "in the

15 production of goods for commerce."  29 U.S.C. § 207(a).  "Commerce" means interstate commerce.

16 29 U.S.C. § 203(b).  The question, therefore, is whether plaintiffs were employed by an enterprise

17 engaged in interstate commerce.  The FLSA applies to an enterprise whose annual gross volume of

18 business done is not less than $500,000.00.  *See* 29 U.S.C. § 203(s)(1).  Lomarey had such volume.

19 Defendants assert that the construction labor was not related to Lomarey's primary business of loan

20 brokerage and thus cannot be treated as labor performed in interstate commerce.  However, the

21 construction of the complex by Lomarey and its Plan for their own benefit appears to be related to

22 Lomarey's other business activities for the purposes of the FLSA.  *See* 29 C.F.R. § 779.208.

23    The evidence does not establish that the FLSA applies to any of the labor performed for

24 entities or individuals other than Lomarey.

25         **3.  Corrigan As Employer Under FLSA**

26    Federal law provides that to "'[e]mploy' includes to suffer or permit to work."  29 U.S.C. §

27 203(g).  However, there is a dearth of authority interpreting that language under federal law.  Given

28 that the statute should be interpreted liberally to promote the statutory purpose of protecting

Findings of Fact and Conclusions of Law
C-09-02013

United States District Court
For the Northern District of California

workers, an inclusive interpretation is appropriate. *See Walling v. Wolff*, 63 F. Supp 605, 607-8 (D.C.N.Y. 1945). Further, the FLSA, unlike California law as it now exists, additionally supports the conclusion that a corporate manager like Corrigan should be treated as an employer where he has substantial ownership interest with operational control of significant aspects of the corporation's day-to-day functions. *See Boucher v. Shaw*, 572 F.3d 1090-91 (9th Cir. 2009).

### 4. Willfulness

A violation of the FLSA is willful if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA. *Chao v. A-One Medical Services*, 346 F.3d 908, 918 (9th Cir. 2003). The burden is on the employee to show willfulness. *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2nd Cir. 2009).

Little evidence was presented on the issue of willfulness. That said, Tikker and Corrigan had worked prior to the commencement of the Lomarey construction project in or with the construction industry for a number of years and appear to have known the requirement to pay overtime. Moreover, the defendants had seen checks showing hours worked and rates of pay (*e.g.*, DPC wage statements). Given defendants' background and experience, it seems highly likely that they either knew of their obligation to pay for overtime or, if they did not know, were reckless in the disregard of their obligations under the FLSA. Therefore, their failure to pay overtime was willful.

### 5. Calculation of Liquidated Damages

| Plaintiff | Work Dates for Lomarey | Overtime Hours | Regular Rate of Pay | Project | Amount of Liquidated Damages |
|-----------|------------------------|----------------|---------------------|---------|------------------------------|
| Jaime Lozaro | 9/16/06-3/6/07 | 480 | $13 per hour | Lomarey | $3185.00 |
| Jaime Lozaro | 3/7/07-11/09/07 | 625 | $16/hour | Lomarey | $5000.00 |
| Edgar Lozaro | 4/30/07 | 450 | $12/hour | Lomarey | $2700.00 |

## C. Third Count—Restitution Under California Business & Professions Code § 17200

### 1. Restitution of Wages for Business Practice of Failing to Pay Overtime Wages

Plaintiffs seek their unpaid overtime wages for the four years prior to the filing of their complaint under California Business & Professions Code § 17208, which provides a four year

Findings of Fact and Conclusions of Law
C-09-02013

United States District Court
For the Northern District of California

statute of limitations as opposed to the three year statute governing California Labor Code

violations. Defendants' failure to pay overtime wages was clearly a business practice. Therefore,

plaintiffs are entitled to the overtime wages they earned during the four years prior to the filing of

the complaint.

> We recognize that any business act or practice that violates the Labor Code through
> failure to pay wages is, by definition (§ 17200), an unfair business practice. It follows
> that an action to recover wages that might be barred if brought pursuant to Labor
> Code section 1194 still may be pursued as a UCL action seeking restitution pursuant
> to section 17203 if the failure to pay constitutes a business practice.

*Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 178-79 (Cal. 2000).

### 2. Calculation of Restitution

| Plaintiff | Work Dates | Overtime Hours | Regular Rate of Pay | Project | Restitution Owed and from Whom |
|---|---|---|---|---|---|
| Jaime Lozaro | 01/01/06-05/05/06 | 450 | $12/hour | Tikker project(s): 125 hours<br><br>Tikker and Corrigan project(s): 325 hours | $750.00 from Tikker<br><br>$1950.00 from Tikker and Corrigan jointly and severally |
| Jaime Lozaro | 05/06/06-9/15/06 | 575 | $12/hour | Tikker and Corrigan project(s): 575 hours | $3450.00 from Tikker and Corrigan jointly and severally |
| Jaime Lozaro | 09/16/06-03/06/07 | 550 | $13/hour | Tikker and Corrigan project(s): 60 hours<br><br>Lomarey: 480 hours | $390.00 from Tikker and Corrigan jointly and severally<br><br>$3185.00 from Tikker and Lomarey jointly and severally |

Findings of Fact and Conclusions of Law
C-09-02013

| Jaime Lozaro | 03/07/07-11/09/07 | 625 | $16/hour | Lomarey: 625 hours | $5000.00 from Tikker and Lomarey jointly and severally |
| Edgar Lozaro | 04/30/07-11/09/07 | 450 | $12/hour | Lomarey: 450 hours | $2700.00 from Tikker and Lomarey jointly and severally |

Plaintiffs can recover as restitution only that amount that exceeds what they collect under Count One.

**D.   Fourth Count—Compensation for Missed Mealtime Under California Labor Code § 226.7**

Plaintiffs claim that they were not always afforded at least a thirty minute meal period each day that they worked.  California Labor Code § 512(a) requires that "[a]n employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes."  The employer must pay the employee one additional hour of pay at the employee's regular rate for each day that a meal period is not provided.  Cal. Labor Code § 226.7(b).  Since defendants kept no records of meal breaks and plaintiffs offered some testimony, albeit not very convincing, that they did not always get their full lunch periods, the burden shifts to Tikker to come forward with evidence that an appropriate meal periods were provided.  *See, e.g.*, *Solis v. Best Miracle Corp.*, 709 F. Supp. 2d 843, 850 (C.D. Cal. 2010).  Tikker testified that he gave the plaintiffs an hour for lunch which they could take when they wanted and that plaintiffs' routine was to go to his house and watch a particular Spanish soap opera on television.  Tikker's testimony concerning lunch periods was more credible than plaintiffs' testimony.  Plaintiffs claim that sometimes they were allowed thirty minutes for lunch and at other times an hour, but also claim that whatever time they were given was sometimes cut short.  There is no evidence that they ever complained during their employment about the inadequacy of the meal period, although, in fairness, they may not have known about their legal entitlement to a minimum of thirty minutes.  While Tikker's lack of records places the burden on him to come forward with evidence that

United States District Court
For the Northern District of California

1   appropriate meal periods were provided, his testimony sufficiently met that burden, especially given

2   the weakness and lack of credibility of plaintiffs' testimony.

3   **E. Fifth Count—Waiting Time Penalties Under California Labor Code § 203**

4        Plaintiffs each seek a penalty under California Labor Code § 203 for the willful failure to pay

5   overtime wages due at the time of the termination of their employment.  Section 203 provides in part

6   that "[i]f an employer willfully fails to pay . . . any wages of an employee who is discharged or who

7   quits, the wages of the employee shall continue as a penalty from the due date thereof at the same

8   rate until paid or until an action therefor is commenced; but the wages shall not continue for more

9   than 30 days."  Defendants failure to pay was clearly willful. "The term 'wilful', as it is used in

10  section 203 of the Labor Code, does not mean that the refusal to pay wages must necessarily be

11  based on a deliberate evil purpose to defraud workmen of wages which the employer knows to be

12  due, in order to subject him to the penalty . . . . [T]he term 'wilful' in its ordinary use, merely means

13  that one intentionally fails or refuses to perform an act which is required to be done." *Davis v.*

14  *Morris*, 37 Cal. App. 2d 269, 274 (Cal. Ct. App. 1940).

15       The Lazaros' employment was terminated by Tikker on November 9, 2007 but the evidence

16  is unclear as to for whom they were working at the time.  It is also appears that Jaime left the

17  employment of more than one employer based upon the fact that he apparently worked during the

18  three years before he filed suit for Tikker, Corrigan, Lomarey, and perhaps DPC.  Since Jaime was

19  not paid his overtime wages by any of the defendants, an argument could be made that his wages

20  continued for up to thirty days following the termination of his employment at the different jobs he

21  had.  However, in light of the difficulty of figuring out the relationship among the defendants as

22  employers and the fact that Jaime only seeks thirty days of wages following his firing by Tikker, that

23  is the amount that the court concludes should be awarded for the Labor Code § 203 violation.  The

24  penalties to which plaintiffs are entitled are calculated as follows:

| Plaintiff | Rate of Pay at Termination of Employment | Calculation of Penalty | Employer Responsible |
|-----------|------------------------------------------|------------------------|----------------------|
| Jaime Lozaro | $16/hour | $3,840.00 ($16 x 8 hours x 30 days) | Tikker and Lomarey jointly and severally |

Findings of Fact and Conclusions of Law
C-09-02013

19

| Edgar Lozaro | $12/hour | $2,880.00 ($12 x 8 hours x 30 days) | Tikker and Lomarey jointly and severally |

### F. Sixth Count—Inadequate Wage Statements Under California Labor Code § 226

Plaintiffs also each seek a penalty under California Labor Code § 226 because they were provided with inadequate wage statements. Section 226(a) requires an employer to furnish semi-monthly at the time each payment of wages is made a wage statement showing, among other things, the gross wages earned, the total hours worked, all applicable hourly rates and deductions. This was not done. Section 226(e) entitles an employee who suffers injury from the knowing and intentional failure to comply with section 226(a) to $50.00 for the initial pay period in which a violation occurs and $100.00 for each subsequent violation up to a maximum of $4000.00.

The evidence supports the conclusion that plaintiffs were injured by the violations. The injury stemming from the section 226(a) violations is evidenced by the active dispute regarding overtime hours and pay that has occurred between the parties. *See Wang v. Chinese Daily News, Inc.*, 435 F. Supp. 2d 1042, 1050 (C.D. Cal. 2006) ("[T]his lawsuit, and the difficulty and expense Plaintiffs have encountered in attempting to reconstruct time and pay records, is further evidence of the injury suffered as a result of [defendant's non-compliant] wage statements."). Defendants' failure to provide plaintiffs with accurate and complete records of their overtime hours contributed to the underpayment of plaintiffs and the instigation of the current lawsuit. This appears to be the type of injury envisioned by section 226(e). The facts here contrast with those in *Villacres v. ABM Indus. Inc.*, 384 Fed. Appx. 626 (9th Cir. 2009) where the court found no injury. In that case, the plaintiff "conceded at his deposition that he experienced no harm as a result of the employer's alleged failure of section 226(a)" and argued "that violations of section 226(a) in and of themselves are injuries sufficient to make section 226(e) relief available." *Id.* at 627. There was not a dispute, as here, as to the overtime hours worked and the entitlement to overtime pay.

Tikker, Lomarey and Corrigan violated the requirements of section 226(a) by their knowing and intentional failure to furnish Jaime and Edgar with the required wage statements semimonthly or each time Jaime and Edgar were paid their wages. Therefore, they are entitled to penalties as follows:

Findings of Fact and Conclusions of Law
C-09-02013

20

| Plaintiff | Employer Responsible | Number of Pay Periods with Inadequate or No Wage Statement | Calculation of Penalty |
|---|---|---|---|
| Jaime Lozaro | Tikker and Lomarey jointly and severally | 35 | $3450.00 ((1 pay period x $50) + (34 pay periods x $100)) |
| Edgar Lazaro | Tikker and Lomarey jointly and severally | 20 | $ 950.00 ((1 pay period x $50 + 9 pay periods x $100)) |

### III.

### ENTITLEMENT TO JUDGMENT

Based upon the Findings of Fact and Conclusion of Law set forth above, Jaime Lazaro is entitled to judgment in his favor and against defendants as follows:

**1. Count One (Unpaid Overtime Wages - Cal. Labor Code § 510)**

Against Tikker and Corrigan, jointly and severally in the amount of $3840.00; and against Tikker and Lomarey, jointly and severally, in the amount of $8185.00.

**2. Count Two (Liquidated Damages - 29 U.S.C. § 216(b)**

Against Tikker, Corrigan and Lomarey, jointly and severally, in the amount of $8185.00.

**3. Count Three (Restitution - Cal. Business & Profession Code §§ 17200 et seq.)**

Against Tikker, solely, in the amount of $750.00; against Tikker and Corrigan, jointly and severally, in the amount of $5790.00; and against Tikker and Lomarey, jointly and severally, in the amount of $8185.00 (only that portion not collected under Count One is recoverable).

**4. Count Four (Mandated Meal Period - Cal. Labor Code § 226.7)**

No recovery

**5. Count Five (Waiting Time Penalties - Cal. Labor Code § 203)**

Against Tikker and Lomarey, jointly and severally, in the amount of $3,840.00

**6. Count Six (Inadequate Wage Statements - Cal. Labor Code § 226)**

Against Tikker and Lomarey, jointly and severally, in the amount of $3,450.00

Findings of Fact and Conclusions of Law
C-09-02013

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1

2      Based upon the Findings of Fact and Conclusion of Law set forth above, Edgar Lazaro is

3   entitled to judgment in his favor and against him as follows:

4      **1. Count One (Unpaid Overtime Wages - Cal. Labor Code § 510)**

5          Against Tikker and Lomarey, jointly and severally, in the amount of $2,700.00.

6      **2. Count Two (Liquidated Damages - 29 U.S.C. § 216(b)**

7          Against Tikker, Corrigan and Lomarey, jointly and severally, in the amount of

8          $2,700.00.

9      **3. Count Three (Restitution - Cal. Business & Profession Code §§ 17200 et seq.)**

10         Against Tikker and Lomarey, jointly and severally, in the amount of $2,700.00

11         (recoverable only under Count One or Count Three, not both).

12     **4. Count Four (Mandated Meal Period - Cal. Labor Code § 226.7)**

13         No recovery

14     **5. Count Five (Waiting Time Penalties - Cal. Labor Code § 203)**

15         Against Tikker and Lomarey, jointly and severally, in the amount of $2,880.00

16     **6. Count Six (Inadequate Wage Statements - Cal. Labor Code § 226)**

17         Against Tikker and Lomarey, jointly and severally, in the amount of $950.00.

18

19   DATED:_____2/21/12_____                    *Ronald M. Whyte*
                                                    RONALD M. WHYTE
20                                                  United States District Judge

21

22

23

24

25

26

27

28

Findings of Fact and Conclusions of Law
C-09-02013